1  **WO**

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9  Mary H. Lombardi, a single woman,    )    No. 09-CV-8146-PCT-PGR
                                        )
10              Plaintiff,              )
   v.                                   )
11                                      )    **ORDER**
   Copper Canyon Academy, LLC, et al.,  )
12                                      )
                Defendants.             )
13  _____ )

14      Currently before the court is Defendants' Motion to Dismiss Plaintiff Mary H.

15  Lombardi's ("Ms. Lombardi") state law claims (Claims Six through Twelve in the Second

16  Amended Complaint) pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[1]  This case arises

17  out of allegations made by Plaintiff of improper conduct by Defendants leading up to

18  Plaintiff's discharge from employment.   The motion is fully briefed and ready for

19  disposition.

20  **I.    FACTUAL BACKGROUND**

21      Copper Canyon Academy, LLC ( the "Academy") operates a behavioral school for

22  teen-aged girls who have difficulties with drugs, alcohol, and other behaviors. The Academy

23  is located in Rimrock and Camp Verde, Arizona, and has three housing dormitories used as

24  living quarters. The Academy is the legal subsidy of CRC Health Group, Inc. ("CRC") and

25  Aspen Educational Group, Inc. ("Aspen").

26  _____

27      [1] Defendants do not seek to dismiss Plaintiff's federal causes of action (Plaintiff's First
28  through Third Claims for Relief) or state law equivalents under the Arizona Civil Rights
    Statutes (Plaintiff's Fourth and Fifth Claims).

On November 10, 2003, Plaintiff was hired by the Academy as a residential coach and was assigned to work in the Juniper House dormitory. Ms. Lombardi, as well as other employees, were hired to provide treatment to adolescent girls at the Academy. Ms. Lombardi's annual job performance evaluations "were generally excellent with overall ratings which mostly indicated she was a very good employee who exceeded expectations and objectives."

On June 4, 2008, Ms. Lombardi met with executive director of the Academy, Paul Taylor ("Taylor") and presented him with a letter dated June 2, 2008, which was signed by Ms. Lombardi and some other employees of the Academy.  The letter documented complaints pertaining to violations by the Academy of the Family Medical Leave Act ("FMLA") regarding her supervisor Jerry Dorrington ("Dorrington") and his requested FMLA leave, as well as complaints regarding the replacement of Dorrington (who was over age 40) with a younger, inexperienced, 23 year old employee as Ms. Lombardi's new supervisor.  Taylor read the letter in a meeting with Plaintiff,  but he refused to comment on it or any factual allegations therein. The Academy did not change its decisions.  On June 12, 2008, Ms. Lombardi sent a letter signed by herself, as well as other employees, to CRC management complaining about the selection of the 23-year old female as the replacement for Dorrington. Thereafter, CRC management sent a Human Resources Department employee to the Academy to interview Ms. Lombardi and other employees.  Subsequent to receiving the letter and conducting the interview, neither CRC nor the Academy made any changes in personnel or otherwise.

According to Ms. Lombardi, also in June 2008, subsequent to submitting her complaints, she, as an individual, was subjected to increased scrutiny and harassment by Taylor,  Josh White ("White"), program director of the Academy, and Anne Harmes ("Harmes"), supervisor of the Juniper House.  They allegedly participated in acts of harassment against Ms. Lombardi, including, *inter alia*, closely monitoring her, reporting false job performance corrective action complaints, defaming her, and instituting unfair

schedule assignments with the intent to force her to quit her job.  Plaintiff further alleges that White instructed Harmes and other management to keep a file on her, "hoping to catch some sort of violation."  White stated that Ms. Lombardi was the ringleader regarding complaints to management and it would only be a matter of time before she would no longer be working for the Academy.  He also stated that "Mary (Lombardi) needs to go, she's kinda getting up there and she needs to just go."  Plaintiff further reports that White made statements that older female employees should never have been hired because of their age.

On September 30, 2008, Ms. Lombardi wrote a letter to White and Harmes stating that she believed "management was following a plan to force her to resign because she authored letters to management in June and was considered a ringleader of disgruntled employees by management."  On November 5, 2008, Ms. Lombardi was transferred to the Willow House dormitory which, unlike the Juniper House dormitory, required the use of staircase for access. Ms. Lombardi alleges that the transfer to Willow House dormitory "was designed to make [her] work place unpleasant so that she would quit because White and Taylor knew [she] had blood flow problems in her legs and joint arthritis which would make it difficult for her to walk up and down stairs."  Ms. Lombardi contends that this was part of their overall plan designed to force her to quit her job.

On December 18, 2008, Defendants fired Ms. Lombardi, age 74 years, citing "reduction in force" as the reason. Ms. Lombardi contends that this reason is merely pretextual for Defendants' discriminatory animus because (1) on December 5, 2008, three similarly situated employees were hired to do the same work that Ms. Lombardi did and Academy advertised for residential coach positions in November and December 2008, as well as January 2009; (2) two of the employees hired on December 5, 2008 were under the age of 40 years old and significantly younger than Ms. Lombardi; (3) two additional residential coaches were hired by Academy in January and February 2009; and (4) two other employees who signed letters of complaint in June 2008 were also fired at the same time as

Ms. Lombardi. They too received unjustified, false job performance evaluations in an effort to force them to quit.

Ms. Lombardi filed charges of age discrimination and retaliation for opposing age discrimination with the Federal Equal Employment Opportunities Commission ("EEOC") on June 15, 2009.  On the same day, she filed the same charges with the Arizona Civil Rights Division ("ACRD") of the Arizona Attorney General's Office.  On December 11, 2009, the EEOC issued Ms. Lombardi a notice of right to sue.  On December 23, 2009, the ACRD issued Ms. Lombardi a notice of right to sue.

## II.   **PROCEDURAL BACKGROUND**

On August 3, 2009, Plaintiff filed suit against Defendants in the Superior Court of Arizona, Yavapai County. Thereafter, on September 1, 2009, Defendants properly removed the action to the United States District Court for the District of Arizona and it is now before this Court. Plaintiff's original Complaint and First Amended Complaint were dismissed (Docs. 27 and 42) with leave to file amended complaints.

Ms. Lombardi filed the Second Amended Complaint ("SAC") alleging twelve causes of action[2] against six different defendants ("Defendants").[3]  Defendants filed a Motion to Dismiss seeking to dismiss Plaintiff's state law claims for Wrongful Discharge in violation of A.R.S. § 23-1501(3)(b), Wrongful Discharge in violation of public policy established in

---

[2] Ms. Lombardi's causes of action are as follows: Retaliation for Exercise of Rights protected by FMLA, 29 U.S.C. § 2615(a)(2); Violation of the ADEA, 29 U.S.C. § 623(a)(1); Violation of the ADEA, 29 U.S.C. § 623(d);  Violation of Arizona Civil Rights Act, A.R.S. § 41-1463;  Violation of Arizona Civil Rights Act, A.R.S. § 41-1464;  Wrongful Discharge in violation of A.R.S. § 23-1501(3)(b); Wrongful Discharge in violation of public policy established in Wagenseller v. Scottsdale Memorial Hosp., 147 Ariz. 370 (1985); Breach of the Implied Covenant of Good Faith and Fair Dealing; Intentional Interference with Contractual Relations; Breach of Contract; Intentional Infliction of Emotional Distress; and Negligent Infliction of Emotional Distress.

[3] Ms. Lombardi brings the state and federal claims against Copper Canyon, LLC, CRC Health Group, Inc., Aspen Educational Group, Inc., Paul Taylor and "Jane Doe" Taylor, Josh White and "Jane Doe" White, and Anne Harmes and "John Doe" husband.

1  Wagenseller v. Scottsdale Memorial Hospital, 147 Ariz. 370 (1985), Breach of the Covenant
2  of Good Faith and Fair Dealing, Intentional Interference with Contractual Relations, Breach
3  of Contract, Intentional Infliction of Emotional Distress, and Negligent Infliction of
4  Emotional Distress.  Defendants seek dismissal of the aforementioned state claims under Fed.
5  R. Civ. P. 12(b)(1), arguing that this Court lacks subject matter jurisdiction because all
6  claims are preempted by the National Labor Relation Act, 29 U.S.C. § 151 *et seq.* ("NLRA")
7  and the Family and Medical Leave Act, 29 U.S.C. § 2615 (a)(2) ("FMLA").   In the
8  alternative, Defendants contend that Ms. Lombardi has failed to state a claim for which relief
9  can be granted and therefore, the state claims should be dismissed pursuant to Fed.R.Civ.P
10  12(b)(6).   At this time, Defendants do not seek dismissal of Plaintiff's federal claims
11  (Plaintiff's First through Third Claims for Relief) or state law equivalents under the Arizona
12  Civil Rights Statutes (Plaintiff's Fourth and Fifth Claims).

13  **III.    LEGAL STANDARD AND ANALYSIS**

14  **Fed.R.Civ.P.12(b)(1)**

15       Federal courts have limited subject matter jurisdiction.  The authority of federal courts
16  to assert jurisdiction to hear a particular case extends only to subject matter authorized by the
17  Constitution or by statute.  Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994).
18  In federal court, the burden of establishing subject matter jurisdiction is on the party asserting
19  jurisdiction. See Id. A Rule 12(b)(1) motion will be granted if the complaint fails to allege
20  grounds for federal subject matter jurisdiction, as required by rule 8(a) of the Federal Rules
21  of Civil Procedure. See Warren v. Fox Family Worldwide, 328 F.3d 1136, 1139 (9th
22  Cir.2003).

23       A motion to dismiss under Rule 12(b)(1) can be facial or factual. Safe Air For
24  Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir.2003).  A facial challenge asserts that the
25  complaint, on its face, fails to allege facts that would invoke federal jurisdiction.  Id. A
26  factual attack disputes the veracity of allegations in the complaint that would, if true, invoke
27  federal jurisdiction. Id. In a factual challenge, the court may consider evidence outside the

28

1  pleadings to determine whether it has subject matter jurisdiction. <u>Autery v. United States</u>,

2  424 F.3d 944, 956 (9th Cir.2005).[4]

3  **<u>Fed.R.Civ.P.12(b)(6)</u>**

4          Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short

5  and plain statement of the claim showing that the pleader is entitled to relief." As the

6  Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), Rule 8 does

7  not require detailed factual allegations. However, "it demands more than an unadorned,

8  the-defendant-unlawfully-harmed-me accusation." <u>Id</u>. at 555 (citing <u>Papasan v. Allain</u>, 478

9  U.S. 265, 286 (1986). A pleading that merely provides "labels and conclusions" or "a

10 formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S.

11 at 555. Furthermore, a complaint that provides strictly  "naked assertion[s]" devoid of

12 "further factual enhancement" will not suffice.[5]  <u>Id</u>. at 557.  Thus, to survive a 12(b)(6)

13 motion to dismiss, a complaint must contain sufficient factual matter,  that when accepted

14 as true, states "a claim to relief that is plausible on its face." <u>Id</u>. at 570.  "A claim has facial

15 plausibility when the plaintiff pleads factual content that allows the court to draw the

16 reasonable inference that *the defendant is liable for the misconduct alleged*."  <u>Id</u>. at 556.

17 (Emphasis added). The plausibility standard requires showing more than a sheer possibility

18 that a defendant has acted unlawfully. <u>Ibid</u>. Despite having to take all of the factual

19 allegations in the complaint as true for the purposes of a motion to dismiss, the court is not

20

21          [4] Where a factual challenge is asserted, "no presumptive truthfulness attaches to
22 plaintiff's allegations, and the existence of disputed material facts will not preclude the trial
   court from evaluating for itself the merits of jurisdictional claims." <u>Roberts</u>, 812 F.2d at 1177
23 (quoting <u>Augustine v. United States</u>, 704 F.2d 1074, 1077 (9th Cir.1983)) (internal
24 quotations omitted).

25          [5] While legal conclusions can provide the framework of a complaint, they must be
   supported by factual allegations. When there are well-pleaded factual allegations, a court
26 should assume their veracity and then determine whether they plausibly give rise to an
   entitlement to relief.  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009).
27

28

1   "bound to accept as true a legal conclusion couched as a factual allegation." (internal
2   quotation marks omitted).  Id. at 555.

3   **A.      National Labor Relation Act, 29 U.S.C. § 151 *et seq.* ("NLRA")**

4          In her SAC, Plaintiff asserts state law claims for Wrongful Discharge in Violation of
5   A.R.S. § 23-1501(3)(b) (Count Six); Breach of Implied Covenant of Good Faith and Fair
6   Dealing (Count Eight), Intentional Interference with Contractual Relations (Count Nine); and
7   Breach of Contract (Count Ten).   In response, Defendants contend that the National Labor
8   Relation Act, 29 U.S.C. § 151 *et seq.*, preempts all such claims. Thus, the Court will examine
9   the NLRA as it pertains to the pending matters.

10         The NLRA preempts any claim for relief in federal or state court based on conduct
11  which is prohibited by its provisions.  San Diego Bldg. Trades Council v. Garmon, 359 U.S.
12  236 (1959). In Garmon, the Supreme Court declared the general rule concerning the
13  preemptive effect of the NLRA and the jurisdiction of the National Labor Relations Board
14  ("NLRB").

15             When an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as
16             well as the federal courts must defer to the exclusive competence of the
               National Labor Relations Board if the danger of interference with national
17             labor policy is to be averted.

18  Id. at 245.  The Garmon court explained that:

19             To leave the States free to regulate conduct so plainly within the central aim
               of federal regulation involves too great a danger of conflict between power
20             asserted by Congress and requirements imposed by state law. Nor has it
               mattered whether the States have acted through laws of broad general
21             application rather than laws specifically directed towards the governance of
               industrial relations. Regardless of the mode adopted, to allow the states to
22             control conduct which is the subject of national regulation would create
               potential frustration of national purposes.

23  Id. at 244.  State law claims are not preempted where the activity regulated is merely a
24  peripheral concern of the NLRA or "where the regulated conduct touched interests so deeply
25  rooted in local feeling and responsibility that, in the absence of compelling congressional
26  direction, it could not infer that Congress deprived the states of the power to act." Id. at 243-
27  44.

28
                                              - 7 -

In deciding a preemption issue under the NLRA, a court must first determine "whether there is an arguable case for preemption; if there is, it must defer to the Board, and only if the Board decides that the conduct is not protected or prohibited may the court entertain the litigation." Int'l Longshoreman's Ass'n v. Davis, 476 U.S. 380, 397(1986).  The NLRA protects employees who engage in "concerted activities" for the purpose of "mutual aid or protection." 29 U.S.C. § 157.  Accordingly, if the Plaintiff has participated in a concerted activity for the mutual aid or protection of others and that is what has caused her termination and thereby given rise to this lawsuit, the NLRA is triggered.

Thus, the Court must determine whether Plaintiff was and is participating in a concerted activity.  Although the term "concerted activities" is not defined in the statute, case law explains that "it clearly enough embraces the activities of employees who have joined together to achieve common goals."  NLRB v. City Disposal Sys. Inc., 465 U.S. 822, 830 (1984).  An employee must act "with or on behalf of other employees, and not solely by and on behalf of the . . . employee himself" in order for the action to be considered a concerted activity. NLRB. v. Mike Yurosek & Son, Inc., 53 F.2d 261, 264 (9th Cir. 1995) (citing Pac. Electricord Co. v. NLRB, 261 F.2d 310, 310 (9th Cir. 1966)).   More specifically, Ms. Lombardi's claims for discrimination, retaliation, and termination are not based on her exercise of rights protected by the NLRA.  She does not contend that Defendants terminated her because she and her co-workers collectively complained about the alleged mistreatment in the workplace.  She has alleged that she, as an individual, was terminated because she opposed FMLA violations and because of age discrimination she experienced. She has not asserted any rights or claims on behalf of any other individuals, group(s), or otherwise. These claims are not grounded in labor disputes protecting the right to act as a group for the benefit of a collective unit or even another employee.  Rather, they are based upon Ms. Lombardi's rights as an individual not to be discriminated against, retaliated against, or unjustly terminated.  Plaintiff has not filed this action before the NLRB for concerted activities, lost, and then "artfully re-pled" her action for concerted activities as state claims.

1    Moreover, such state claims of age discrimination and FMLA retaliation may involve deeply

2    rooted local interests which are often reserved for the courts.

3           Furthermore, the Court finds significant that the Supreme Court held NLRA

4    preemption under Garmon does not act to preempt state law claims if the claims would affect

5    union and non-union employees equally and neither encourage nor discourage the collective

6    bargaining processes that are the subject of the NLRA.   Metropolitan Life Ins. Co. v.

7    Massachusetts, 471 U.S. 724, 755-58 (1985).  The NLRA does not preempt state laws and

8    claims that are not incompatible with the general objectives of the NLRA.  Id. at 753-58.

9    The objectives of the NLRA are to protect the freedom of workers to practice collective

10   bargaining and protect workers' rights to freedom of association, self-organization, and

11   designation of representatives of their own choosing for the purposes of negotiating terms

12   of employment or other mutual aid or protection.  Id.  See also Fort Halifax Packing Co. v.

13   Coyne, 482 U.S. 1, 20 (1987)("NLRA is concerned with ensuring an equitable bargaining

14   process, not with the substantive terms that may emerge from such bargaining."  The NLRA

15   does not provide for a statutory preemption.  The Court specifically held in Metropolitan

16   Life,

17          Where the preemptive effect of federal enactments is not explicit, 'courts
             sustain a local regulation unless it conflicts with federal law or would frustrate
18          the federal scheme, or unless the courts discern from the totality of the
             circumstances that Congress sought to occupy the field to the exclusion of the
19          States.'

20   Metropolitan Life Ins. Co., 471 U.S. at 747, quoting Allis-Chalmers Corp. v. Lueck, 471 U.S.

21   202, 209 (1985); Malone v. White Motor Co., 435 U.S. 497, 504 (1978).

22          As accurately noted by Plaintiff, the relevant state law claims at issue involve statutes

23   and state common law which provide for *individual* causes of action for discrimination,

24   retaliation, and discharge.  They are based on allegations that Defendants engaged in

25   wrongful conduct against Plaintiff as an individual, including discrimination and retaliation

26   for opposing age discrimination and violations of FMLA, as well as discriminatory

27   discharge.  Said claims do not involve activity related to the NLRA such as organizing,

28

collective bargaining, or concerted activities on behalf of another, nor do they "purport to regulate any conduct subject to regulation by the NLRB." Fort Halifax Packing Co., 482 U.S.1 at 22. With regards to the relevant state law claims, the Court finds that they do not implicate the NLRA.  It has not been established that Congress intended to preempt the relevant state laws raised by Plaintiff, and the state laws do not conflict with or frustrate the objectives of the NLRA.  Accordingly,  the Defendants' Motion to Dismiss Counts 6 and 8-10 on the ground that they are preempted by the NLRA is DENIED.

**B.    Family and Medical Leave Act, 29 U.S.C. § 2615 (a)(2)**

Defendants contend that all of Plaintiff's state law claims are preempted by the Family and Medical Leave Act, 29 U.S.C. § 2615 (a)(2).  Defendants cite to numerous district courts cases (*inter alia*, O'Hara v. Mt. Vernon Bd. of Educ., 16 F. Supp. 2d 868, 894 (S.D. Ohio 1998); Kiely v. Univ. of Pittsburgh Med. Center, 2000 U.S. Dist. LEXIS 3156 (W.D. Pa. 2000); See also Alvarez v. Hi-Temp Inc., 2004 U.S. Dist. LEXIS 4755 (N.D. Ill. 2004)) to support their contention that Congress intended that the specific remedies set forth in § 2167 of the FMLA would be the exclusive remedies for a violations of the FMLA.  However, Defendants have wholly failed to provide this Court with any binding or persuasive authority supporting their position that this Court should dismiss all of Plaintiff's state law claims on the basis of FMLA preemption and Congressional intent.  There is no indication that this Court or any Court in this district or circuit subscribes to the minority view as espoused by Defendants or the cases proffered by Defendants.  The Motion to Dismiss all of Plaintiff's state law claims on the grounds of preemption under FMLA is DENIED.

**C.    Wrongful Discharge**

**1.    Wrongful Discharge in Violation of A.R.S. § 23-1501(3)(b) (Count Six)**

In her sixth claim for relief - wrongful discharge in violation of the Arizona Employment Protection Act ("AEPA"), A.R.S. § 23-1501, Ms. Lombardi contends that she was wrongfully discharged contrary to the public policies of Arizona for her opposition to Defendants' violations of the FMLA.

1   The AEPA sets forth the public policies of this state[6] and enumerates the distinct

2   circumstances under which an employee may bring a wrongful discharge action in Arizona.

3   See A.R.S. § 23-1501. One such circumstance is when an employer violates "a statute of this

4   state" or "the public policy set forth in or arising out of the statute." A.R.S. § 23-1501(3)(b).

5   Another is when the employer discharges someone from employment in retaliation for

6   refusing to violate Arizona law or for reporting violations of Arizona law to the employer's

7   management or other investigative authority. A.R.S. § 23-1501(3)(c)(i),(ii).

8   Defendants first argue that Plaintiff cannot maintain this claim because the AEPA

9   does not encompass violations of federal regulations.  Thus, the first issue is whether Ms.

10   Lombardi has stated a claim under the AEPA with regard to her claim grounded in

11   oppositions to violations of the FMLA.  More specifically, whether allegations of violations

12   of the FMLA are necessarily violations of Arizona public policy for purposes of the AEPA.

13   The Court turns to Galati v. America West Airlines, Inc., a case in which the Arizona Court

14   of Appeals considered whether the legislature intended to include federal regulations in the

15   public policy to be vindicated by the AEPA. Galati v. America West Airlines, Inc., 205 Ariz.

16   290 (2003).

17   The Court in Galati explained that the language chosen by our legislature for the

18   AEPA is clear and unequivocal.  Section 23-1501(3)(b) provides a remedy if "[t]he employer

19   has terminated the employment relationship of an employee in violation of a *statute of this*

20   *state*."  (Emphasis added). Section 23-1501(3)(c)(i) provides a remedy if the employee is

21   terminated in retaliation for refusing to commit an act or omission "that would violate the

22   *Constitution of Arizona or the statutes of this state*."  (Emphasis added).  Section

23   23-1501(3)(c)(ii) provides a remedy if the employee is terminated for disclosing to the

24

25   _____

26   [6]Pursuant to the AEPA, it is the public policy of Arizona that employment relationships are contractual in nature.  Absent a contract complying with the requirements outlined in the AEPA, an employment relationship is severable at the pleasure of either party.

27   A.R.S. § 23-1501(1), (2).

28

1   employer, its representative, or an investigatory body a violation of "the *Constitution of*

2   *Arizona or the statutes of this state*." (Emphasis added).  There is no mention of any federal

3   provision, statute, or regulation.  The language contemplates only transgressions of Arizona

4   law as violative of Arizona public policy.  Accordingly, in Galati, the court did not find that

5   a statutory public policy exception exists for whistle-blowing associated with federal

6   regulations. Moreover, it affirmed the trial court's finding that the legislature did not violate

7   the Arizona Constitution by excluding federal regulations from public policy under the

8   AEPA.. Galati, 205 Ariz. at 294, citing Cronin v. Sheldon, 195 Ariz. 531 (1999) (The

9   Arizona supreme court addressed the constitutionality of the AEPA holding that employees

10  asserting wrongful termination claims against their employers for violating the Arizona Civil

11  Rights Act were limited under the AEPA to the statutory remedies set forth that act.)  The

12  Cronin Court also found that the AEPA does not violate the equal privileges clause, the

13  impairment of contract clause, the anti-abrogation clause, the non-limitation clause or the

14  separation of powers clause.  Cronin v. Sheldon, 195 Ariz. 531 (1999).  Accordingly,

15  Plaintiff's allegations involving FMLA violations are not within the parameters of the AEPA

16  and therefore fail to state a claim upon which relief may be granted.[7]

17          Next, Defendants argue that Plaintiff cannot maintain her sixth claim under the AEPA

18  based upon violations of the Arizona Civil Rights Act ("ACRA") either because "the [A]EPA

19  does not provide a back door method of suing [employers] in tort for the wrongful

20

21

22          [7] The Court notes that when determining whether claims survive a motion to dismiss,
    the Court looks to the SAC in its entirety, not merely to the count as articulated.  Thus, the

23  Court must consider if there are *any plausible claims* that can be maintained from the
    allegations asserted, not just the specific statute alleged.  For example, in the case *sub judice*,

24  Plaintiff alleged violations of FMLA in Count Six as the basis for her claim under AEPA.
    However, if the SAC as a whole demonstrates a violation of AEPA, the claim should not be

25  dismissed for failure to cite the correct section of the AEPA that was violated or failure to
    state which source statute was violated under the AEPA.  Based on the SAC in its entirety,

26  the Plaintiff has alleged sufficient facts to state a claim for wrongful discharge under A.R.S.
    § 23-1501.

27

28

termination in violation of ACRA or its public policy." <u>Taylor v. Graham County Chamber of Commerce</u>, 201 Ariz. 184, 188 (2001).  To determine whether Plaintiff's claims are authorized under the AEPA,  the Court must look to the pertinent language of the statute. Pursuant to AEPA, an employee has a claim in tort for wrongful termination[8] against an employer if "the employer has terminated the employment relationship of an employee in violation of a statute of this state."  But note that, "if the statute provides a remedy to an employee for a violation of the statute, the remedies provided to an employee for a violation of the statute are the exclusive remedies for the violation of the statute or the public policy set forth in or arising out of the statute, including the following: (i) The civil rights act prescribed in title 41, chapter 9. *** "  § 23-1501(3)(b).  The question then becomes, does this language prohibit a plaintiff from bringing the cause of action at all or does it merely limit a plaintiff's remedies.  The parties have failed to address this issue.  The Court will not dismiss the claim without further analysis of this critical issue because it cannot be established, based upon the papers before the Court, that Plaintiff has failed to state a claim upon which relief may be granted.

An employee also has a claim in tort for wrongful termination under the AEPA if "the employer has terminated the employment relationship of an employee in retaliation for," *inter alia*,

> The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

---

[8] Wrongful termination and wrongful discharge are used interchangeably in case law and statutory law, and likewise in this order.

A.R.S. § 23-1501 (3)(c).  In the present matter, Ms. Lombardi has alleged sufficient facts in her SAC to assert a claim that her termination was at least in part the result of retaliation against her for opposing age discrimination.  For the reasons stated above, the Motion to Dismiss is DENIED.

**2.      Common Law Wrongful Discharge in Violation of Public Policy (Count Seven)**

In her SAC, Plaintiff asserts that she was wrongfully discharged on December 18, 2008, in violation of public policy as established by common law in <u>Wagenseller v. Scottsdale Memorial Hospital</u>, 147 Ariz. 370 (1985).  Defendants move to dismiss this claim on the ground that the Arizona legislature enacted the AEPA in effect to supercede <u>Wagenseller</u>.  In <u>Wagenseller</u>, the Arizona supreme court held that an at-will employee of a hospital could bring a wrongful termination suit alleging that she was fired in violation of Arizona's public policy. <u>Wagenseller</u>, 147 Ariz. at 389.  The court said that "an employer may fire for good cause or for no cause. He may not fire for bad cause-that which violates public policy." <u>Id.</u> at 378.   The court defined public policy to include violations of our statutory, constitutional, and common law. <u>Id.</u> at 378-80.

The Arizona legislature enacted the AEPA in 1996 in direct response to <u>Wagenseller</u> because "it took express exception to the court's indication that it rather than the legislature had the authority to define public policy." <u>See</u> <u>Galati</u>, 205 Ariz. at (2003), quoting Employment Protection Act Ch. 140, § 1, para. A, 1996 Ariz. Sess. Laws 683, 684.  It was the intent of the legislature to limit the availability of wrongful termination for the violation of public policy.  Therefore, as established above, the AEPA limited the circumstances under which a discharged employee may sue an employer to those situations involving either qualifying written contracts or an employer violating the public policy of the state *as enunciated in the state constitution and statutes*.   <u>Johnson v. Hispanic Broadcasters of Tucson, Inc.</u>, 196 Ariz. 597, 599 (Ariz. Ct. App. 2000).(Emphasis added)

In her seventh claim for relief, Ms. Lombardi specifically alleges that as a result of

the Defendants' actions, they are liable to her for wrongful discharge in violation of common law public policy as established in <u>Wagenseller</u>.  She cites <u>Logan v. Forever Living Prod. Int'l</u>, 203 Ariz. 191, 194-95 (2002) and <u>Galati v. America West Airlines, Inc.</u>, 205 Ariz. 290, 294 (2003) to support her argument that the tort of wrongful discharge based upon common law public policy of Arizona still exists.

In <u>Logan</u>, the plaintiffs brought an action for wrongful termination alleging they were discharged by their employer for not selling their property to him at the price he demanded. Logan, 203 Ariz. at 192.  The superior court dismissed the action for failure to state a claim and the court of appeals affirmed. <u>Id</u>.  The Arizona Supreme Court vacated the decision of the court of appeals and reversed the judgment of the trial court. <u>Id</u>. at 195.  The court held that the plaintiffs in fact stated a claim for wrongful termination under the AEPA. <u>Id</u>.  The court explained that one of the express purposes of the AEPA is to provide protection to employees from employers exacting "fees, gratuities, commissions, kickbacks, or other forms of remuneration from employees as a condition of continuing employment or as a condition to obtaining employment in the first instance." <u>Id</u>. at 194.  Thus, because the court found that the Logans' claim fell directly within the parameters of the AEPA, the court explained, "we need not reach the question, raised by our associate in a separate concurring opinion, whether a common law cause of action of the kind asserted by the Logans may still be asserted independent of the AEPA." <u>Id</u>. at 195.  As such, the court did not affirmatively decide the question; rather it merely left open the possibility that a cause of action for common law wrongful termination may still exist.

Likewise, in <u>Galati,</u> the court did not foreclose the idea that a common law tort of wrongful discharge based upon public policy remains in Arizona in the post-<u>Wagenseller</u> era. Galati was employed by America West Airlines ("AWA") as a flight attendant until he was discharged in January 1999. He filed suit against AWA asserting that he was wrongfully terminated for being a whistle-blower; and his claims were based on violations of Federal Aviation Administration  regulations.  AWA filed a motion to dismiss for failure to state a

- 15 -

viable claim under Arizona Rule of Civil Procedure 12(b)(6) arguing that Galati had failed to plead a violation of Arizona statutory or constitutional law as required by the AEPA. The trial court dismissed the case. It found that Galati's claims, grounded in federal violations, did not fall within the scope of A.R.S. § 23-1501. Galati timely appealed. The court of appeals held that (1) a statutory public policy exception did not exist for whistle-blowing associated with federal regulations and (2) the Airline Deregulation Act preempted the flight attendant's state cause of action. It further explained, with great significance to the present case, "[w]hether a common law tort for wrongful termination still exists after the AEPA is an open and much debated question in Arizona law." Id. at 294. Both Logan and Galati remain good law in Arizona and establish support for Plaintiff that, contrary to the Defendants' steadfast assertion otherwise, Plaintiff's common law tort for wrongful termination claim is not foreclosed as a matter of law merely based upon the enactment of the AEPA. Accordingly, the Motion to Dismiss Count Seven of Plaintiff's SAC is DENIED.[9]

**D.    Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress**

Fed.R.Civ.P. 12(b)(1)

In Count Eleven, Plaintiff contends that the Defendants' conduct was "intentional, outrageous, and unconscionable in its scope and severity, and Defendants either intended to

---

[9] When considering a motion to dismiss, this Court must "accept as true all material allegations in the complaint and construe them in the light most favorable to the plaintiff." Westlands Water Dist. v. Firebaugh Canal, 10 F.3d 667, 670 (9th Cir.1993). Accordingly, the facts considered by this Court are gleaned directly from the allegations of Plaintiff's SAC. Upon careful review, the Court has determined that based on the conduct alleged, there is sufficient factual content in the SAC for the Court to *infer* a plausible claim of wrongful discharge. Twombly, 550 U.S. at 570. Plaintiff is cautioned that since the inception of the AEPA, common law wrongful discharge claims based upon public policy are limited, as the legislature now favors the comprehensive statutory scheme of the AEPA. The motion to dismiss stage is merely the threshold, Plaintiff still bears the burden of establishing a prima facie case with authoritative support therefor.

1    cause emotional distress or recklessly disregarded the near certainty that such distress would

2    result from their conduct. Furthermore, this conduct was without legal justification. Such

3    actions caused severe emotional distress to Lombardi."  Plaintiff maintains that "she has

4    suffered and will continue to suffer for the rest of her life emotional distress, mental anguish,

5    anxiety, anger, pain and suffering, stress, insecurity, shame, and depression."  As stated,

6    Plaintiff was 73 years old when she made the complaints in June 2008 and 74 years old in

7    December 2008 when she was discharged.

8         The Supreme Court has limited Garmon-preemption in the context of intentional

9    infliction of emotional (IIED) distress based on its interpretation of the NLRA.  It has

10   explained that the NLRA does not preempt *all* claims brought by an employee against an

11   employer.  In an often cited case, the Supreme Court explained,

12        [i]nflexible application of the doctrine is to be avoided, especially where the
         State has a substantial interest in regulation of the conduct at issue and the
13        State's interest is one that does not threaten undue interference with the federal
         regulatory scheme. With respect to [the employee's] claims of intentional
14        infliction of emotional distress, we cannot conclude that Congress intended
         exclusive jurisdiction to lie in the Board.

15   Farmer v. United Brotherhood of Carpenters and Joiners of America, 430 U.S. 290, 302

16   (1977) . The Court continued, "[n]o provision of the National Labor Relations Act protects

17   the 'outrageous conduct' complained of by [the employee]...."

18        In Farmer, the Supreme Court held that a claim for IIED was not preempted by the

19   NLRA. The court explained that in order for such a claim to avoid preemption, "it is essential

20   that the state tort be either *unrelated to employment discrimination* or a function of the

21   particularly abusive manner in which the discrimination is accomplished or threatened rather

22   than a function of the actual or threatened discrimination itself." Id. at 305. (Emphasis

23   added).  The employee's cause of action depended on the "outrageousness" of the conduct

24   and whether the manner of conduct was proper or was beyond the scope of labor relations

25   regulated by federal law. The Court concluded that the state's interest in protecting its

26   citizens from the kind of abuse of which the employee in Farmer complained outweighed any

27

28

minimal potential for interference with the federal scheme of regulation. <u>Id.</u> at 302-304.

The "unrelated to employment discrimination" prong of the <u>Farmer</u> test, "is equivalent to a requirement that the facts not be 'inextricably intertwined' with a labor law duty established by the collective bargaining agreement." <u>Truex v. Garret Freightliners, Inc.</u>, 784 F.2d 1347, 1351 (9th Cir. 1985) (citing <u>Bloom v. International Brotherhood of Teamsters, Local 468</u>, 752 F.2d 1312 (9th Cir.1984)). Ms. Lombardi's claims for intentional and negligent infliction of emotional distress, however, are wholly independent from the terms of any collective bargaining agreement.   Rather, the claims are based on the discrete incidences of alleged wrongful conduct of Defendants.   The claims are specific to the individuals as opposed to the employment institution, unrelated to any collective bargaining agreement, and were particularly outrageous given her age, the length of time for which the conduct was committed, and the nature of the conduct itself.   Furthermore, although the alleged actions by Defendants took place in the employment environment, they do not concern matters within the scope of federal labor policy.

The Court finds further support that this claim is not preempted in that the alleged infliction of emotional distress upon a single employee as described in the SAC is at best a "peripheral" concern of the NLRB, and instead is a concern best suited for this Court.

Accordingly, Defendants' Motion to Dismiss Plaintiff's claims for IIED (Count Eleven) and NIED (Count Twelve) under Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction based on NLRA preemption is DENIED.

**Fed.R.Civ.P. 12(b)(6)**

In the alternative, Defendants claim that assuming the Court does have jurisdiction over the emotional distress claims, they should nevertheless be dismissed, as Ms. Lombardi has failed to state a claim (for IIED and NIED) upon which the Court can grant relief. Fed. R. Civ. P. 12(b)(6).  Having determined that the Court does have jurisdiction over these two claims, the Court will now consider whether Plaintiff has validly stated her claims under R.12(b)(6).

1

### 1.   IIED

2      Under Arizona law, a Plaintiff must prove the following three elements to successfully

3  establish a claim for IIED: (1) the defendant's conduct must be "extreme" and "outrageous";

4  (2) the defendant must either intend to cause the emotional distress or recklessly disregard

5  the near certainty that severe distress will result from the conduct; and (3) severe emotional

6  distress must occur as a result of the defendant's conduct. Ford v. Revlon, 153 Ariz. 38, 43

7  (1987).  To satisfy the first element, "[a] plaintiff must show that the defendant's acts were

8  'so outrageous in character and so extreme a degree, as to go beyond all possible bounds of

9  decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'"

10  Mintz v. Bell Atl. Sys. Leasing, Int'l, 183 Ariz. 550, 554 (App. 1995).  Quite notably, "[i]t

11  is extremely rare to find conduct in the employment context that will rise to the level of

12  outrageousness necessary to provide a basis for recovery for the tort of [IIED]." Mintz, 183

13  Ariz. at 554.  Even when a defendant's conduct is wrongful and unjustifiable, it does not

14  necessarily rise to the level of "atrocious" beyond all possible bounds of decency such that

15  it would cause an average member of the community to believe that it was extreme or

16  outrageous. Nelson v. Phoenix Resort Corp., 181 Ariz. 188, 199 (App. 1984).

17      To survive a motion to dismiss, the Supreme Court has held that Rule 8 does not

18  require detailed factual allegations. Twombly, 550 U.S. 544. "A claim has facial plausibility

19  when the plaintiff pleads factual content that allows the court to draw the reasonable

20  inference" that *the defendant is liable for the misconduct alleged*." Id. at 556.  Here, Plaintiff

21  has set forth sufficient factual allegations in her SAC to permit the Court to draw reasonable

22  inferences to support plausible claims of IIED and NIED for the Court.   Id. at 556.

23  Moreover, determination of such fact-intensive claims is generally based upon the

24  sufficiency of evidence, testimony, and may often depend upon the credibility of witnesses-

25  all to be weighed by the fact-finder, not the Court. Unless it is a matter of clearly established

26  law, the Court will not dismiss such a claim at this stage of the litigation without further

27  inquiry and discovery.

28

1

## 2.    NIED

2    Ms. Lombardi's final cause of action is for NIED. Ms. Lombardi alleges that

3    Defendants' conduct was such that it unintentionally caused her emotional distress which

4    they should have realized involved an unreasonable risk of causing the alleged distress.  The

5    conduct included "harassment by close monitoring, false job performance corrective action

6    complaints, defamation about Lombardi to students, unfair schedule assignments, moving

7    Ms. Lombardi to another dormitory that would be unpleasant to her because of physical

8    limitations, and complaints about her age" over the course of approximately six months.

9    These actions by Defendants allegedly caused Ms. Lombardi to suffer "emotional distress,

10   mental anguish, anxiety, anger, pain and suffering, stress, insecurity, shame, and depression."

11   Moreover, she has alleged that it caused her such distress that it prompted her to write a letter

12   to management regarding her fear that she might lose her job.

13    Defendants argue that this claim should be dismissed because Arizona's Workers'

14   Compensation Act, A.R.S. § 23-1022 (A), is the exclusive remedy against the employer for

15   work-related injuries. Arizona Workers' Compensation Act provides the exclusive remedy

16   for employees who are *accidentally* injured in the course of their employment.  A.R.S. § 23-

17   1021.  (Emphasis added).    The statute provides, "[t]he right to recover compensation

18   pursuant to this chapter for injuries sustained by an employee ... is the *exclusive remedy*

19   against the employer or any co-employee acting in the scope of his employment[.]" A.R.S.

20   § 23-1022 (A) (Emphasis added).  "A mental injury ...shall not be considered a personal

21   injury by accident ... and is not compensable ... unless ...unexpected, unusual or extraordinary

22   stress ... was a substantial contributing cause." A.R.S. § 23-1043.01(B).  More specifically,

23   concern over job security is not compensable under worker's compensation because this type

24   of stress is not the result of any "unexpected, unusual or extraordinary stress related to the

25   employment."  La Pare v. Industrial, 154 Ariz. 318 (App. 1987).

26    In the pending matter, Plaintiff has alleged a mental injury caused by the stress,

27   anxiety, and surrounding distress resulting from her fear of losing her job.  Plaintiff further

28

1   alleged that the injury was not unexpected, as Defendants knew or should have known that

2   their conduct created an unreasonable risk of such mental distress and Defendants devised

3   a plan to force Plaintiff to quit said job prior to discharging Plaintiff. The Court finds that

4   based on the allegations set forth in the SAC, assuming Plaintiff can prevail on her claim,

5   she has demonstrated that her distress was not unexpected.  Accordingly, Arizona Workers'

6   Compensation Act does not apply to this claim and the Court has jurisdiction to hear this

7   claim.

8       In Arizona, to recover for the tort of NIED, a plaintiff must have been in the zone of

9   danger so that the negligent defendant created an unreasonable risk of bodily harm to

10  plaintiff and the emotional distress inflicted by defendant's negligent conduct "must be

11  manifested as a physical injury." Rowland v. Union Hills Country Club, 157 Ariz. 301, 304

12  (App. 1988). Ms. Lombardi alleges that Defendants' conduct caused her, *inter alia*, anxiety,

13  pain and suffering, and depression. In Arizona, short-lived physical manifestations do not

14  sufficiently constitute physical injury for purposes of a NIED claim.   Burns v. Jaquays

15  Mining Co., 156 Ariz. 375, 379, (holding that headaches, weeping, muscle spasms,

16  depression, and insomnia were transitory physical phenomena that do not sustain a cause of

17  action for emotional distress).  However, physical injury and long-term physical illness or

18  mental disturbance constitute sufficient bodily harm to support a claim of NIED. Monaco

19  v. Health Partners of S. Arizona, 196 Ariz. 299, 303 (App. 1999) (holding that Plaintiff stated

20  a claim for NIED when he suffered from nightmares, depressive syndrome, sleepless nights,

21  and was diagnosed with post-traumatic stress disorder).  It is clear based upon Arizona

22  precedent that long-term physical illness or mental disturbance constitutes sufficient bodily

23  harm to support a claim of NIED. Id. at 304. Weighing the evidence to determine whether

24  Plaintiff's specific circumstances give rise to such a claim is reserved for the fact-finder after

25  sufficient discovery has been conducted.  Nevertheless, based on the allegations that she has

26  suffered the foregoing injuries over the course of time, Plaintiff has sufficiently stated a claim

27  for NIED.  Accordingly, the Motion to Dismiss Plaintiff's NIED claim is DENIED.

28

**III.**   **CONCLUSION**

Accordingly**,**

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Plaintiff's claims for wrongful discharge in violation of A.R.S. §23-1501 (**Count Six**); wrongful discharge in violation of public policy (**Count Seven**); breach of implied duty of good faith and fair dealing (**Count Eight**); intentional interference with contractual relations (**Count Nine**); breach of contract (**Count Ten**); intentional infliction of emotional distress (**Count Eleven**); and negligent infliction of emotional distress (**Count Twelve**) is **DENIED**.

DATED this 21st day of September, 2010.

Paul G. Rosenblatt
United States District Judge